Exhibit A

Steven E. Ross (SR 9361)
William D. Dunn (WD 6998)
Michael P. Cooley (MC 1214)
GARDERE WYNNE SEWELL LLP
3000 Thanksgiving Tower
1601 Elm Street
Dallas, Texas 75201
Telephone: (214) 999-4824
Facsimile: (214) 999-3824

Anthony F. Lo Cicero (AL 7538)
Marc J. Jason (MJ 0934)
AMSTER, ROTHSTEIN & EBENSTEIN LLP
90 Park Avenue
New York, NY 10016
(212) 336-8000 – Telephone
(212) 336-8001 - Facsimile
COUNSEL FOR AMERICAN PAD & PAPER, LLC

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------- X
NATIONAL ENVELOPE CORPORATION       :
AND NATIONAL ENVELOPE-WH LLC,       :
                                     :
        PLAINTIFFS,                  :
                                     :
V.                                   :          CIVIL ACTION NO.
                                     :          1:06-CV-12988-CSH
AMERICAN                             :
PAD & PAPER LLC,                     :
                                     :
        DEFENDANT.                   :
----------------------------------------------------- X

## DECLARATION OF ROBERT M. FRANK, PH.D.

Robert M. Frank, Ph.D. states as follows:

      1.     My name is Robert M. Frank.  I am over the age of twenty-one, of sound mind,

have never been convicted of a felony or crime of moral turpitude, and am fully competent to

make this declaration.  The factual statements set forth herein are within my personal knowledge and are true and correct.

2.      I am the founder and president of Illuminor LLC, which provides consulting and expert witness services to law firms and corporations involved in trademark infringement matters, especially those that center on claims of descriptiveness, dilution or genericness.  I have more than 23 years experience in the trademark industry, including extensive field work researching and analyzing federal, state, and common law trademarks trade names and services marks.

3.      From 1983 to 1998, I was the founder and president of CORSEARCH, an intellectual property research firm specializing in the research needs of trademark practitioners which, as of 1996, was completing nearly 20,000 trademark searches per year for clients who were mainly Fortune 500 companies or their outside counsel.  As a result of these searches, I became experienced recognizing the types of third-party use typically cited to deny registrability.

4.      During my affiliation with CORSEARCH, I personally completed over 5,000 full U.S. comprehensive trademark searches, including searches relating to major product launches including Fruitopia, a product marketed by Coca-Cola, and Special Additions for Haagen-Daz. In addition, I trained more than 50 trademark researchers and developed the materials and systems used to train at least 100 more trademark researchers.  I also have extensive experience reviewing search strategies and finished reports employed and prepared by other researchers, including approximately 45,000 trademark searches while at CORSEARCH.

5.      In addition, I personally designed, developed, configured, maintained and used proprietary databases specifically designed for searching and retrieving information related to

trademarks, and have extensive training and experience in the use of research databases such as DIALOG, Lexis/Nexis and Westlaw as well as proprietary systems owned by private companies. All of these sources are generally accepted tools used to record and analyze third-party use in the trademark field.  I trained United States Patent and Trademark Office ("USPTO") personnel for more than five years on how trademark databases should be searched.

6.      I have been a member of the International Trademark Association ("INTA") since 1985.  During that time, I attended more than 40 seminars, conferences and workshops on trademark-related issues sponsored primarily by INTA for its members, as well as organizations such as the Bar Association of the City of New York, the New York State Bar Association, and the New Jersey Bar Association.  I have also served as the co-chair of the International Trademark Association's Patent and Trademark Office Automation Committee and INTA's Internet Domain Names Task Force, and have given presentations on the issues of domain names and trademarks.  Based upon my work with CORSEARCH and in the trademark industry, I was also asked to be a founding member of the Board of Governers of INTA's Brand Names Education Foundation, where I served from approximately 1993 to 1998.  In addition, I have authored numerous works and made presentations directly related to trademark issues.  I have testified and/or reported as an expert witness on trademark-related issues in approximately 10 trademark infringement cases, and my opinions have never been criticized by the court or excluded.

7.      I was engaged by Defendant American Pad & Paper LLC ("Ampad") in the above-captioned litigation to investigate the nature and scope, if any, of third party use of the term "Peel & Seel" and its phonetic equivalents in the marketplace, using standard and generally

accepted intellectual property research methodologies.   Attached as Exhibit A-1 to this Declaration is a true and correct copy of my expert report (the "Report").

8.     Often, a key aspect of the evidence presented in cases involving claims of descriptiveness, dilution or genericness relates to use (or lack of use) by third parties of the alleged trademark or ones similar to it.  The public obtains a large amount of its information about products and services from two sources in addition to television: (1) print media such as magazines, newspapers, trade journals and industry publications, and (2) online sources (such as the Internet) using the search engines Google and Yahoo.  I addressed the issue of third-party use in this case primarily by gathering and analyzing information from both of these information sources.

9.     To identify instances where a mark was mentioned in a magazine, newspaper, trade journal or industry publication, Illuminor uses an information service known as Dialog. Dialog is a pay-as-you-go subscription service that has been in existence since the 1970's. The Dialog system consists of over 540 different files (databases) which contain coverage of practically every major newspaper, magazine, trade journal, professional journal, scholarly journal, press release or business report printed in the Western / English speaking world (although more and more non-English language publications are being added to the system annually.) The various databases on Dialog have content as early as the 1950's and are as current as yesterday.  Quite literally, Dialog has hundreds of millions of articles from tens of thousands of publications on their system.  Dialog is a primary source of common-law information for trademark research reports conducted by leading trademark research firms and has consistently

been found to be a reliable source of information for trademark research and trademark law attorneys.

10.     The purpose in conducting research on Dialog is to determine the scope of coverage and the amount of print media attention that references a particular word or phrase in a particular context. By thoroughly researching Dialog, a trademark searcher is better able to ascertain the type, amount and frequency of exposure that a particular word or phrase would have to the members of the public who obtain information from print sources such as magazines, newspapers, trade journals, product evaluations or press releases.

11.     The purpose in conducting research on the Internet *via* search engines such as Yahoo and Google is to determine the amount, frequency and type of exposure that a particular word or phrase has to members of the public who seek information from the Internet. Quite often the use of a particular word or phrase is found on the web and is not found on Dialog. This is primarily due to many small companies that have a "web presence" but are not large or unique enough to have obtained coverage of their products or services *via* traditional print media. The best way to ascertain coverage and use of a term or phrase in the primary sources (besides television) that consumers most often use to obtain information about products and services is to review both Dialog and the Internet.

12.     In conducting my investigation and analysis in this case, I utilized both of these resources. Based on my experience in trademark searching, I developed search protocols consistent with those used by trademark search firms and the USPTO. Using these established and generally accepted search protocols, I eliminated irrelevant search results and focused my analysis on generic and descriptive uses of "peel & seal" and its phonetic equivalents for

envelopes with which the user "pulls" or "peels" away a strip to reveal an adhesive that "seals" the envelope.

13.     My methodology requires that I input search criteria which are then compared against a database or the Internet which results in a factual output of relevant usage of a given term.  My results are factually developed based on standard search criteria and independently maintained databases and the Internet.

14.     As a result of my Dialog search, I discovered articles mentioning "peel & seal" and its phonetic equivalents in 17 publications.

15.     My Internet search methodology produced over 417,000 results for "peel & seal" and its phonetic equivalents, including "Peel & Seel."  My report analyzes the first 90 results.  In those results, I discovered generic usage of "peel & seal" and its phonetic equivalents in 17 different online glossaries, in procurement documents from 16 separate governmental agencies, in 73 different Internet pages on 58 different Websites, in six patents, and in Plaintiffs' own use.

16.     My Internet search methodology revealed multiple glossary definitions for "peel & seal" or its phonetic equivalents including: "Term used for adhesive which is exposed by **peeling** away coated release paper"; "Adhesive which is exposed by **peeling** away a release strip, and which will then stick to just about anything"; "A self adhering seal strip on the seal flap with a protective strip covering the adhesive.  **As the name implies**, the protective **seal** is **peeled** away to expose the adhesive and close the envelope."  (emphasis added).

17.     My search methodology revealed that sixteen separate governmental agency, university or organization Websites were found on which "peel & seal" or its phonetic equivalents were used in a generic fashion on procurement documents.

18.     Pursuant to my search methodology, I discovered 73 Internet pages from 58 Websites using "peel & seal" or its phonetic equivalents in connection with the sale of envelopes.

19.     I discovered six patents that contained "peel & seal" or its phonetic equivalents in the descriptive text included within the patent.

20.     On May 30, 2009 through June 8, 2009 I conducted a replication study to verify my results.  The replication study utilizes the same methodologies as those that resulted in the Report with three primary differences:  (1) I only reviewed search results that returned "peel & seal" or its phonetic equivalents in the organic search result summary; (2) I verified the search results that returned "peel & seal" or its phonetic equivalents were not authorized by NEC by searching for any evidence of NEC's stylized logo mark; and (3) I tabulated my results.  The verified test results indicated that 96.6% of the search results for "peel & seal" or its phonetic equivalents were generic uses of those phrases (compared with 95.5% in my report).

21.     As a result of my research, it is my opinion that PEEL & SEEL is an intentional misspelling, corrupted spelling, and the phonetic equivalent of the normal English phrase "peel and seal."

22.     Based on the research I conducted, it is my opinion that "peel and seal," in the context of envelopes, is predominantly used as a common name for: (1) a type of closure for an envelope where a strip of release paper covers an adhesive on the seal flap and is peeled away so as to expose the adhesive and allow for the sealing of the envelope, and (2) a type of envelope having such a closure.

"I declare under penalty of perjury under the laws of the United States of America (28 U.S.C. § 1746) that the foregoing is true and correct."


Executed on June 22, 2009.

Robert M. Frank, Ph.D.