USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 12/30/09

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NATIONAL ENVELOPE CORPORATION, et al.,

                Plaintiffs,

- against -

AMERICAN PAD & PAPER COMPANY OF
DELAWARE, INC., et al.,

                Defendants.

OPINION & ORDER

06 Civ. 12988 (SHS) (RLE)

**RONALD L. ELLIS, United States Magistrate Judge:**

## I. Introduction

On November 7, 2006, National Envelope Corporation and National Envelope - WH LCC (collectively, "NEC") brought this action against the American Pad & Paper Company of Delaware, Inc. and American Pad & Paper, LLC (collectively "Ampad"), claiming 1) breach of contract under the laws of New York State; 2) trademark infringement in violation of 15 U.S.C. § 1114(1); 3) unfair competition and false designation of origin in commerce under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); 4) deceptive trade practices in violation of New York General Business Law § 349; 5) trademark dilution in violation of New York General Business Law § 360-l; 6) common law unfair competition under the laws of New York State; and 7) unjust enrichment under the laws of New York State. On June 9, 2009, NEC moved *in limine* to exclude the expert report and testimony of Dr. Robert M. Frank. (Doc. No. 95.) On September 15, 2009, NEC moved *in limine* to exclude the expert report and testimony of Walter Bratic. (Doc. No. 113.) Oral arguments were heard by the undersigned on both motions on November 3, 2009.

For the reasons that follow, NEC's motion to exclude the expert report of Dr. Frank

(Doc.'s No. 95-97) is **DENIED**. NEC's motion to exclude portions of the expert report of Walter Bratic (Doc.'s No. 113, 115) is **GRANTED, in part, and DENIED, in part.**

## II. BACKGROUND

This case arose out of Ampad's use of PULL & SEAL and its application to use the mark with the U.S. Patent and Trademark Office. (Compl. at 3.) NEC argues that its mark, PEEL & SEEL, is confusingly similar to Ampad's mark PULL & SEAL. *Id.* Both parties use the mark to identify envelopes with an adhesive closure covered by a strip of release paper. *Id.* at 3, 5. In November, 2000, NEC purchased Williamhouse LLC (now National Envelope - WH LCC) from Ampad and simultaneously acquired all rights, title, and interest in the PEEL & SEEL mark. *Id.* at 3. Under a license agreement stemming from the purchase, Ampad was allegedly licensed to use the PEEL & SEEL mark, had agreed not to contest NEC's exclusive right and title to the mark, and had agreed to notify NEC of any infringing use of the mark. *Id.* at 4. NEC argues that Ampad's use of PULL & SEAL is inconsistent with and contests NEC's exclusive right and title to the PEEL & SEEL mark, and infringes on NEC's mark. *Id.* at 5-7. Ampad asserts that it uses the PULL & SEAL mark without infringing NEC because of the parties agreement in Bankruptcy Court (*see In re American Pad & Paper LLC*. Case No. 02-46551, E.D. Texas) where Ampad allegedly rejected the licensing agreement to which NEC refers in the Complaint. (Ampad's Answer ("Answer"), Doc. No. XX at 7.) Ampad further argues that the mark is generic, that NEC abandoned its rights to the mark, and that NEC's claims are barred under the doctrine of fair use pursuant to 15 U.S.C. § 1115(b)(4). *Id.* Moreover, Ampad states that NEC's claims are barred by the doctrine of laches, estoppel, and/or acquiescence, and that NEC lacks standing as to one or more of its claims. *Id.* at 8. Finally, Ampad has brought counterclaims against NEC seeking declaratory relief and cancellation of NEC's mark registration on the

2

grounds that the mark is generic and merely descriptive. *Id.* at 9-12.

### III. DISCUSSION

#### A.     Motions *in Limine* and the *Daubert* Standard

Motions *in limine* allow the Court to rule in advance of trial on the admissibility and relevance of certain forecasted evidence. *See Luce v. United States*, 469 U.S. 38, 41 n.4 (1984); *Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir. 1996). The Court is guided by the *Daubert* standard as to the admissibility of both Dr. Frank's and Walter Bratic's testimony.

FRE 702 provides that, unless barred by other evidence rules, expert testimony is admissible "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods to the case." FED. R. EVID. 702. Courts liberally construe the expert requirement and "an expert should not be required to satisfy an overly narrow test of his own qualifications." *Valentin v. New York City*, No. 94 Civ. 3911 (CLP), 1997 WL 33323099 at *14 (E.D.N.Y. Sept. 9, 1997) (citations and quotations omitted). "In considering a witness's practical experience and educational background as criteria for qualification, the only matter the court should be concerned with is whether the expert's knowledge of the subject is such that his opinion will likely assist the trier of fact in arriving at the truth." *Id.* "Any challenges to an expert's skill, knowledge or credibility go to the weight, not the admissibility of the testimony." *Id.* at *15. To determine admissibility, the Court must decide if the proffered testimony is relevant and reliable. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 587, 597 (1993). Testimony is relevant

3

if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." FED. R. EVID. 401. In assessing reliability and whether to admit the testimony of a proposed expert, the court must determine whether the testimony (1) relates to "scientific knowledge" and (2) will "assist the trier of fact to understand or determine a fact in issue." *Daubert* 509 U.S. at 592. To determine if scientific knowledge will assist the trier of fact, a court must assess an expert's methodology to determine if it is scientifically valid and can properly be applied to the facts in issue. *Id.* at 592-93. To determine reliability, the *Daubert* Court provided a list of factors to be considered. These include whether a theory or techniques can be and has been tested; if it has been subjected to peer review and publication; the known or potential rate of error; and whether the theory or technique has been "generally accepted." *Id.* at 593-94. "A reliability assessment does not require, although it does permit, explicit identification of a relevant scientific community and an express determination of a particular degree of acceptance within that community." *Id.* at 594. In addition, "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." FED. R. EVID. 403. The court's inquiry is a flexible one and its overarching subject is the scientific validity and evidentiary relevance and reliability of the principles that underlie a proposed submission. *Daubert* 509 U.S. at 594-95. "The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Id.* "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* at 596.

## B. Dr. Frank's Testimony and Expert Report

Ampad submitted Dr. Frank's expert report in order to "investigate the nature and scope of third-party use of the term 'peel and seal' and its phonetic equivalents in the marketplace." (Defendant's Memorandum of Law in Opposition to Plaintiff's Motion to Exclude Expert Report and Testimony of Robert M. Frank, PhD. "Ampad's Frank Response" at 2.) It argues that "extensive third-party use can dilute the strength of a mark." *Id.* Essentially, Ampad takes the position that the mark "peel and seal" is generic and merely descriptive and seeks to use Dr. Frank's testimony as to third-party use in order to bolster its genericness and descriptive arguments. (*See* Compl. at 9-12; Memorandum of Law in Support of Plaintiff's Motion to Exclude the Expert Report and Testimony of Robert M. Frank, Ph.D. ("NEC's Motion") at 2.)

### 1. Third-Party Use and Genericness

A generic trademark is not entitled to protection. *Pilates, Inc. v. Current Concepts, Inc.*, 120 F. Supp. 2d 286, 296 (S.D.N.Y., Oct. 19, 2000). "A mark's common usage and understanding by the relevant public may be discerned from 'any competent source.'" *Jewish Sephardic Yellow Pages, Ltd. v. DAG Media, Inc.*, 478 F. Supp. 2d 340, 360 (E.D.N.Y. Mar. 19, 2007) (citing *In re Merrill Lynch*, 828 F.2d 1567, 1570 (Fed. Cir. 1987)) [hereinafter *Jewish Sephardic*]. A court may consider all relevant evidence, including 1) consumer surveys, 2) testimony of consumers or trade professionals, 3) dictionary definitions, 4) uncontested usage of the mark by competitors to describe their products, 5) generic usage in the media, 6) third-party use in trademark registrations, and 7) generic usage by the proponent of the trademark." *Id.*; *Pilates*, 120 F. Supp. 2d at 297; *Horizon Mills Corp. v. QVC, Inc.*, 161 F. Supp. 2d 208, 214 (S.D.N.Y., Mar. 30, 2001); *Nartron Corp. v. STMicroelectronics, Inc.*, 305 F. 3d 397, 406 (6th Cir. 2002). "No single factor is dispositive." *Jewish Sephardic*, 478 F. Supp. 2d at 360.

5

Consumer surveys are probative and routinely employed, but not required since they are not dispositive. *Jewish Sephardic*, 478 F. Supp. 2d at 365. The lack of consumer surveys is not fatal to a party's claim of genericness. *Id.* More importantly, the use of a word or term in dictionaries, magazines, and newspapers gives a strong indication of the general public's perception of the particular word or term. *Harley-Davidson, Inc. v. Grottanelli*, 164 F. 3d 806, 810-11 (2d. Cir. 1999). In particular, "a term is generic when the majority of the buying public associates the term with a product, rather than the source of the product, whether the source is known or unknown." *Horizon Mills*, 161 F. Supp. 2d at 213. At this stage in the proceedings, the Court need not decide whether the mark is generic because genericness standards merely inform the Court as to the relevance of the proffered expert testimony by Dr. Frank.

### 2. Dr. Frank's Expert Report is Admissible

Here, NEC argues that Dr. Frank's expert report should be excluded from trial on the grounds that 1) Dr. Frank is not qualified, 2) his opinions are unreliable, and 3) his testimony is irrelevant. (NEC Motion at 10, 12, 16.) NEC frames trademark genericness as an issue of consumer perception and states that "Dr. Frank is not an expert in consumer perception research by education, training, or experience." (*Id.* at 11 (citing Dr. Frank's deposition testimony)). NEC believes that because Dr. Frank did not investigate consumers' understanding of the PEEL & SEEL mark, he is not qualified to render an opinion as to the mark's genericness. (*Id.* at 12.) In addition, NEC asserts that Dr. Frank's testimony is unreliable because he conducted no objective testing, survey or research into consumer perceptions or understanding. (*Id.* at 13.) According to NEC, Dr. Frank sampled the wrong universe - manufacturers and sellers of envelopes, instead of consumers - and then drew conclusions about consumers from that wrong universe. (*Id.* at 14.) Moreover, claims NEC, Dr. Frank's Internet searches "did not even attempt to simulate

6

marketplace conditions under which consumers shop for relevant envelope products," thus the testimony was unreliable because it did not relate to consumers. (*Id.*) NEC argues that Dr. Frank's testimony does not fit within the *Daubert* standard because Dr. Frank followed "his own prescribed procedures" that have not been published or subject to peer review, he did not employ generally accepted standards for the field of consumer research, and his verification report does not prove that his technique has been accurately tested. (*Id.*; Reply Memorandum of Law in Further Support of Plaintiff's Motion to Exclude Expert Report and Testimony of Robert M. Frank, PhD. ("NEC's Reply") at 8.) Finally, NEC states that Dr. Franks opinions are irrelevant because he "offered no scientifically accepted, empirically supported way to bridge the chasm between his findings about sellers' uses and his opinions concerning consumers' understandings." (NEC Motion at 17.)

In response to NEC, Ampad asserts that 1) Dr. Frank's testimony is relevant, 2) he is qualified, 3) his methodology and opinions are reliable, and 4) NEC's arguments go to the weight of the evidence, not admissibility. (Ampad's Frank Response at 5, 7, 11, 21.) Specifically, it maintains that the testimony is relevant because it demonstrates third-party use of the mark and the strength of the mark in light of such use. (*Id.* at 6.) Ampad argues that Dr. Frank is qualified because he has twenty three years of experience in the trademark industry and is "experienced in recognizing the types of third-party use typically cited to deny registrability." (*Id.* at 8-9.) Dr. Frank served as a co-chair of the International Trademark Association's (INTA) Patent and Trademark Office Automation Committee and trained United States Patent and Trademark Office (USPTO) personnel for more than five years on how trademark databases were designed and should be searched. (*Id.* at 9-10.) Moreover, Ampad argues that Dr. Frank's methodology and opinion is reliable because it is supported by the facts, it is generally accepted,

7

it has been tested, the potential rate of error is low, and Dr. Frank has been published. (*Id.* at 12-21.) Finally, Ampad relies on the fact that the *Daubert* analysis focuses on the Court's gatekeeping function and thus any arguments posed by NEC go to the weight of Dr. Frank's report, not the admissibility. (*Id.* at 21; *Daubert*, 509 U.S. at 595.)

The crux of the issue here is relevance. The Frank Report is relevant because it will provide the trier of fact with information about third-party use, which is a factor to be considered for genericness. *See Jewish Sephardic*, 478 F. Supp. 2d at 360; *Pilates*, 120 F. Supp. 2d at 297; *Horizon Mills*, 161 F. Supp. 2d at 214; *Nartron Corp.*, 305 F. 3d at 406. The primary purpose of the *Daubert* inquiry is to bar "junk science" from entering the courtroom. *Delehanty v. KLI, Inc.*, 2009 WL 3246289 *4 (E.D.N.Y. Sept. 30, 2009). "An example of junk science that should be excluded under *Daubert* as too unreliable would be the testimony of a phrenologist who would purport to prove a defendant's future dangerousness based on the contours of the defendant's skull." *General Elec. Co. v. Joiner*, 522 U.S. 136, 154 n.6 (1997) (Stevens, J., concurring in part, dissenting in part). If a case does not involve "junk science" or new scientific methods, courts have found that analysis of the *Daubert* factors in unnecessary. *New York v. Solvent Chem. Co. Inc.*, 218 F. Supp. 2d 319, 334 (W.D.N.Y. July 22, 2002) (citing *Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137 (1999). The Frank Report does not fall under the ambit of "junk science" because it is a simple, straightforward method of searching the Internet and databases to determine third-party use. The report is relevant because third-party use can show genericness.

Dr. Frank's report is reliable because it is not "junk science." It provides information on third-party use and includes Dr. Frank's opinion that such use contributes to the mark's genericness. (*See* Ampad Response at 2.) Dr. Frank's methodology is reliable because he simply searched the term "peel and seal" and generated a report on its use in public discourse. Dr. Frank

8

gathered facts and data pertinent to the amount, frequency, and type of third-party use of those terms from a comprehensive search database (Dialog) and the Internet. (*Id.* at 2.) He did not engage in confusing or novel scientific techniques, instead he searched 564 databases through Dialog and the Internet. (*Id.* at 11-15.) His search included glossaries, third-party use by competitors and other people in the trade, media usage, and NEC's use of the mark. (*Id.*) NEC argues, nevertheless, that Dr. Frank failed to survey consumers directly on their use of the mark and therefore the report fails to prove genericness. Such an argument, however, is best reserved for the trier of fact because it goes to the weight of the evidence. An Internet and database search compiled to show third-party use is easily understandable to a jury because it does not involve technical scientific procedures or knowledge. On the contrary, most people understand that basic tenets of Internet and database searching. His report is applicable to the facts of the case because it relates to Ampad's cross-claims based on genericness and mere descriptiveness by showing third-party usage of the mark.

Additionally, Dr. Frank is qualified. He has lengthy experience in the trademark research industry. (Ampad's Response at 8.) Moreover, he completed over 5,000 comprehensive trademark searches while employed at CORSEARCH, a research firm specializing in research needs of trademark practitioners, and trained more than 50 trademark researchers and developed systems used to train at least 100 more trademark researchers. (*Id.* at 8-9.) Neither party disputes the fact that Dr. Frank has a professional background in trademark searching. (*Id.*; NEC Motion at 3) but NEC argues that Dr. Frank's lack of training in "how to do a consumer survey in the trademark area," renders him unqualified. Although his lack of training in surveys might make Dr. Frank less credible for a jury, it does not affect his qualifications because consumer surveys are not dispositive in genericness analysis.

9

Even if Dr. Frank's report were evaluated as novel or "junk" science, it would still meet some of the *Daubert* factors for admissibility. *See Solvent Chem. Co. Inc.*, 218 F. Supp. 2d at 334 (finding it unnecessary to consider the *Daubert* factors if the science is not "junk science" or novel). First, Dr. Frank tested his technique in this particular case by conducting a verification test. (Ampad Response at 19; NEC Reply at 8.) His verification test replicated the searches he conducted of "peel and seal" and showed that the search results were almost exactly the same. *Id.* Ampad posits that "the ability to replicate Frank's research and return virtually identical results lends credence to the reliability of Frank's methodologies." (Ampad Response at 20.) NEC argues that the analysis is based on an inflated numerator over an irrelevant denominator, and that the entire analysis is patently defective and should not be included at all. (NEC Reply at 8.) Whether the test is defective may be argued before the trier of fact. This factor only asks whether the methodology *can be or has been* tested, and here Ampad has shown that, at the very least, this methodology *can be* tested. Whether the test is credible is another question, one best addressed by the parties for the jury's consideration.

Second, Dr. Frank's methods of research have been reviewed by the USPTO, which utilizes the same type of research techniques used by Dr. Frank in his report. (Ampad Response at 20.) Neither party contends, however, that Dr. Frank has actually submitted his own written material for publication to a journal or like publication for peer review. Though not formally reviewed, Dr. Frank's methodology has been adopted by the very agency charged with making this kind of determination. While lack of formal review affects credibility, it does not lead to a finding of inadmissibility.

Third, Ampad argues that the potential rate of error in Internet and database searching is low because the results of the searches are a "factual development based on standard search

10

criteria and independently maintained databases and the Internet." (Ampad Response at 20.) On its face, it does not seem that there is a potential for extreme error in Internet and database searching and compiling of results because the methodology is straightforward and merely consists of assessing third-party use of the mark. NEC contends that there are no standards controlling the operation of Dr. Frank's methodology or allowing for an objective assessment of his rate of error. Such an argument is best reserved for the trier of fact. Here, the science is not novel and thus rate of error is merely a factor the Court may consider; it is not dispositive.

Finally, the type of research Dr. Frank conducted has been "generally accepted." As evidence of general acceptance, Ampad cites the USPTO's adoption of similar search methodologies, specifically "Evidence from Research Database" and "Internet Evidence" as permissible sources of evidence used to refuse an application for registration of a mark. (Ampad Response at 17.) Dr. Frank spent five years training USPTO personnel on the methodology of searching trademark databases in order to generate reports for the USPTO. (*Id.*) NEC frames the relevant field as consumer research and concludes that Dr. Frank's methodology is not generally accepted by the field because it does not meet the rigorous standards of the industry. (NEC Motion at 15.) However, the relevant field is broader than just consumer research and is better represented by the term "trademark research." Third-party users include not only consumers, but also competitors, people in the trade, sellers, and various other people and businesses that may be exposed to the "peel and seal" mark. On the facts submitted, Dr. Frank's methodology is generally accepted in the trademark research field.

In sum, the expert report is admissible because it is relevant to the issue of whether the mark is generic. Moreover, it is reliable because Dr. Frank's methodology is straightforward and does not involve highly technical, novel, or "junk" science. The primary purpose of the *Daubert*

11

inquiry is to bar "junk science" from entering the courtroom. *Delehanty*, 2009 WL 3246289 *4, and the Court's inquiry is a flexible one. *Daubert*, 509 U.S. at 594-95. As such, NEC's motion to exclude Dr. Frank's expert report is **DENIED**. The Frank Report is **ADMISSIBLE**.

## C.   Bratic's Testimony and Expert Report

Ampad submitted the Rebuttal Expert Report of Walter Bratic ("Bratic Report") to provide an expert opinion as to the damages issues in this case. (Defendant's Memorandum of Law in Opposition to Plaintiff's Motion to Exclude Expert Report and Testimony of Walter Bratic ("Ampad's Bratic Resp.") at 2-3.) NEC seeks to exclude portions of the report on the grounds that NEC is only claiming infringing profits and the Bratic Report goes beyond the bounds of infringing profits by considering both lost profits and reasonable royalties. (Memorandum of Law in Support of Plaintiff's Motion to Exclude Portions of the Expert Report and Testimony of Walter Bratic ("NEC Bratic Motion") at 1, *document filed under seal* Doc. No. 115.) Specifically, NEC asks the Court to strike the portions of the report that relate to lost profits and reasonably royalties. (NEC Bratic Motion at 2.) NEC also asks the Court to strike Ampad's claimed costs and deductions from infringing revenues. (*Id.*)

### 1. Damages under the Lanham Act

Section 35 of the Lanham Act states, in part, that "the plaintiff shall be entitled, subject to the provisions of sections 1111 and 1112 of this title and subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. The court shall assess such profits and damages or cause the same to be assessed under its direction. In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed." 15 U.S.C.A. § 1117(a). If a plaintiff is pursuing an infringing profits theory of damages, the plaintiff must prove the

12

amount of defendant's infringing sales, and the *burden then shifts* to the defendants to prove all costs and deductions. *Louis Vuitton S.A. v. Spencer Handbags Corp.*, 765 F.2d 966, 973 (2d Cir. 1985); *American Honda Motor Co., Inc. v. Two Wheel Corp.*, 918 F.2d 1060, 1063 (2d Cir. 1990); *Reebok Int'l Ltd. v. Su Youn Pak*, No. 87 Civ. 2727 (TPG), 1990 WL 91644 at *1 (S.D.N.Y. June 28, 1990) (emphasis added). "Ordinarily, a plaintiff that has proved the amount of infringing sales would be entitled to that amount unless the defendant adequately proved the amount of costs to be deducted from it." *Reebok*, 1990 WL 91644 at *1. Overhead costs bearing a nexus to product production or sales may be deducted in assessing overall profits. *Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.*, No. 04 Civ. 7369 (LTS), 2006 WL 2128785 at *8 (S.D.N.Y. July 28, 2006) (citing *Hamil Am. Inc. v. GFI Inc.*, 193 F.3d 92, 107 (2d Cir. 1999)). "A party must show that the costs were related to the production, distribution or sale of the infringing product." *Id.* (internal quotations and citations omitted). "A plaintiff need not demonstrate that it would have earned a profit on its trademarked goods or services but for the infringing activity of the defendant; even if a money-losing enterprise cannot demonstrate 'lost profits,' it still may be damaged by trademark infringement. While damages directly measure the plaintiff's loss, defendant's profits measure the defendant's gain. This is not to be confused with plaintiff's lost profits, which have been traditionally compensable as an element of plaintiff's damages." *The Apollos Theater Foundation, Inc. v. Western Intern. Syndication*, No. 02 Civ. 10037 (DLC), 2005 WL 1041141 at *10 (S.D.N.Y. May 5, 2005) (internal quotations and citations omitted).

### 2. Bratic's Report is Partially Admissible

NEC has elected to seek recovery of Ampad's alleged infringing profits (NEC Bratic Motion at 1.) NEC maintains that because it is only seeking this remedy, any testimony as to

NEC's lost profits or reasonable royalties are irrelevant and prejudicial. (*Id.* at 5.) NEC claims that since Rule 702 and its *Daubert* progeny instruct courts to admit relevant, reliable evidence that "fits," the proffered testimony by Bratic simply does not "fit" and is irrelevant because it does not fit within NEC's damages theory. *Id.* Additionally, NEC asserts that Bratic's opinion as to lost profits and reasonable royalties will confuse the jury because the only damage theory at issue is infringing profits. *Id.* NEC claims it will be unfairly prejudiced by Bratic's opinion regarding lost profits and reasonable royalties because NEC did not have the benefit of discovery on either of those damages theories. (*Id.* at 6.) Finally, NEC argues that a rebuttal report cannot introduce new arguments of lost profit and reasonable royalties. *Id.* (citing *Ebbert, et al. v. Nassau County, et al.*, 2008 U.S. Dist. LEXIS 74213 at \*\*39-42 (E.D.N.Y. Sept. 26, 2008).

Ampad claims that Bratic's entire report is admissible because it is directly relevant and not prejudicial to NEC. (Ampad's Bratic Resp. at 7-11.) Ampad asserts that "Bratic's opinions regarding the lack of direct damages and an alternative reasonable royalty help explain why NEC has suffered no (or at most nominal) damages." (*Id.* at 8.) Ampad maintains that any opinion regarding monetary damages will inform the ultimate question that the jury and Court must decide. (*Id.*) According to Ampad, the Bratic Report is a proper rebuttal because it fills in voids the NEC expert failed to address, namely, lost profits and reasonable royalties. (*Id.* at 9.) Finally, Ampad explains that NEC could not possibly be prejudiced by the Bratic Report because NEC had months to conduct expert discovery and rebut Bratic's opinions. (*Id.* at 11.)

At a hearing before the Court on November 3, 2009, NEC stipulated that it would only pursue an infringing profits theory of damages at trial and in all proceedings in this case. Because of this stipulation, any evidence of lost profits or reasonable royalties are not relevant because the only damages theory in this case is infringing profits. "The court shall assess profits

14

and damages." (15 U.S.C.A. § 1117) and here the relevant profits and damages to be considered by the Court are the alleged infringing profits of Ampad. Therefore, NEC's motion as to portions of the Bratic Report that opine on lost profits or reasonable royalties is **GRANTED** and such portions are **STRICKEN** from the report. Specifically, the portions that shall be stricken are: ¶¶ 10-12, ¶ 29, Heading 6.1 (NEC Has Not Suffered Direct Damages), ¶¶ 31-37, Heading 6.2(Alternative Reasonable Royalty Damages), and ¶¶38-48. All other sections of the Bratic Report are **ADMISSIBLE**.

NEC argues that the rest of the Bratic Report should be excluded because it was untimely. (NEC Motion at 2.) Specifically, it asserts that Ampad had the burden of proof for claiming any costs or deductions and thus Ampad should have submitted its expert report by April 20, 2009, the date upon which expert reports were due. (*Id.*) Ampad instead submitted its report on May 26, 22009, the deadline for rebuttal expert reports. (*Id.*) Ampad was correct in submitting its report as a rebuttal because the *burden shifts* to the Defendant once the Plaintiff has proven the amount of infringing sales. *See Louis Vuitton S.A. v. Spencer Handbags Corp.*, 765 F.2d 966, 973 (2d Cir. 1985); *American Honda Motor Co., Inc. v. Two Wheel Corp.*, 918 F.2d 1060, 1063 (2d Cir. 1990); *Reebok Int'l Ltd. v. Su Youn Pak*, No. 87 Civ. 2727 (TPG), 1990 WL 91644 at *1 (S.D.N.Y. June 28, 1990). Bratic's report was a timely and proper rebuttal to NEC's expert damages report. NEC's timeliness argument fails and the motion to deny the remaining portions of the Bratic Report is **DENIED**.

### IV. CONCLUSION

For the foregoing reasons, NEC's motion to exclude the testimony and expert report of Dr. Frank is **DENIED**. NEC's motion to exclude portions of the testimony and expert report of Walter Bratic is **GRANTED, in part and DENIED, in part.**

SO ORDERED this 22nd day of December 2009
New York, New York

*[signature]*

The Honorable Ronald L. Ellis
United States Magistrate Judge